**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 08-61618-CIV-ALTONAGA/Brown**

**ROLYN COMPANIES, INC.,**

      Plaintiff,

vs.

**R & J SALES OF TEXAS, INC., d/b/a**
**PRECISION RESTORATION &**
**ROOFING**, *et al.*,

      Defendants.

_____/

**ORDER**

**THIS CAUSE** came before the Court on the following motions: (1) Plaintiff, Rolyn

Companies, Inc.'s Motion for Summary Judgment Against Defendant, Crum & Forster Specialty

Insurance Company [D.E. 66]; (2) Plaintiff, Rolyn Companies, Inc.'s Motion for Summary Judgment

Against Defendant, Admiral Insurance Company [D.E. 67]; (3) Defendant, Admiral Insurance

Company's Motion for Summary Judgment Against Plaintiff, Rolyn Companies, Inc. [D.E. 63]; and

(4) Defendant, Crum & Forster Specialty Insurance Company's Motion for Summary Judgment

[D.E. 80].  The Court has carefully considered the parties' submissions and the applicable law.

**I.  BACKGROUND**

In October 2005, toward the end of the hurricane season called "the most damaging in a

generation,"[1] Hurricane Wilma battered South Florida.  One of its casualties was Stonebridge

Gardens ("Stonebridge"), a condominium community located in Lauderhill, Florida, and made up

of 16 buildings, four condominium associations, and over 400 individual units.  Within days after

_____

[1]  *Hurricane Wilma: Battered by the Storm*, Economist, Oct. 29, 2005.

the hurricane, the community was condemned, its residents were forced to evacuate, and electricity was shut off indefinitely.

Two of the associations[2] retained Rolyn Companies, Inc. ("Rolyn"), a general contractor specializing in disaster-recovery construction, to repair their buildings.  Rolyn, in turn, retained R & J Sales of Texas, Inc. d/b/a Precision Restoration and Roofing ("Precision"), a roofing subcontractor, to repair the roofs.  Shortly after Precision began work on the roof of one of the buildings, Building 2800, it rained heavily.  Owing to water intrusion, the interior of Building 2800 was significantly damaged.  It was Precision's faulty workmanship, asserts Rolyn, that permitted the intrusion to occur.

Rolyn's later attempts to have Precision repair the damage were unavailing, and Rolyn began to feel pressure of a lawsuit from the unit owners.  When one owner sued, Rolyn tendered the lawsuit to its insurer, Crum & Forster Specialty Insurance Company ("Crum & Forster"), and to Precision's insurer, Admiral Insurance Company ("Admiral").  Although Crum & Forster defended in that lawsuit, Admiral denied coverage.  Rolyn ultimately "tried to do the right thing" (DiDonato Dep. 97:21, July 8, 2009), and repaired the interiors of *all* the units — at a cost of over $1,300,000.

Rolyn eventually filed this suit against Precision, Crum & Forster, and Admiral for damages and declaratory relief.  The Motions before the Court concern whether Crum & Forster and Admiral owe coverage to Rolyn according to their respective insurance policies.  The Court concludes they do not.  Therefore, the Court grants the Motions of Crum & Forster and Admiral, and denies the

---

[2]  Stonebridge Gardens, Sections One and Three, Condominium Association, Inc.  This lawsuit concerns only Section One.

CASE NO. 08-61618-CIV-ALTONAGA/Brown

Motions of Rolyn.

**A.      The condition of Building 2800 after Wilma**

Regarding the entire Stonebridge community as unsafe, the City of Lauderhill condemned it within days after Hurricane Wilma battered South Florida.  (*See* DiDonato Dep. 31:14–32:9).  To protect the units after the residents evacuated, all four associations covered the roofs of the buildings with "shrink wrap."  (*Id.* 40:24).  But the roofs of buildings 2800, 2802, and 2804 (collectively, "Building 2800") of Section One were not covered because "it was probably [in] the best condition of all the roofs," according to Frank DiDonato, a unit owner and association board member.  (*Id.* 45:17–18).  Indeed, the damage to Building 2800 appeared to be minimal.  Rolyn's Holleé Finlay saw "a very small water stain" on the ceiling in one of the units, but "no other real damage."  (Finlay Dep. 63:12–18, July 16, 2009).  Rolyn's Greg Sweetwood saw broken windows in other buildings, but not in Building 2800.  (*See* Sweetwood Dep. 29:1–6, July 29, 2009).  Describing his first-floor unit, DiDonato said: "Excellent, untouched, pristine."  (DiDonato Dep. 33:17).

Yet by the summer of 2006, accounts about the condition of Building 2800 were not as good.  According to photographs taken in June, there were holes and openings through the mansard roof surfaces of portions of buildings 2802 and 2804.  (*See* RIMKUS CONSULTING GROUP, INC., INTERIM REPORT OF FINDINGS 7 (Aug. 7, 2009) [hereinafter INTERIM REPORT] [D.E. 92-1]).  Mansard roof sheathing showed signs of decay.  (*See id.*).  Photographs taken in July showed "apparent fungal growth, water stains, and ongoing distress in the interior finished surfaces."  (*Id.* 8).  Ryan Regan, a subcontractor who had been inside Building 2800 by May 2006, described its units as "fairly typical to any of the other buildings in Sections I and III.  One unit could be in pristine shape because

CASE NO. 08-61618-CIV-ALTONAGA/Brown

it wasn't affected by the hurricane.  The next one the ceiling could have dropped down and could have debris throughout."  (Regan Dep. 82:24–83:4, July 9, 2009).  Regan recalls seeing water intrusion and mold growth inside Building 2800 by then.  (*See id.* 83:5–13).  According to Rolyn's field notes, there were leaks in Building 2800 and wet drywall and carpet in 16 of the 24 units.  (*See* Weekly-Update, July 26, 2006 [D.E. 92-11]).

Meanwhile, the City of Lauderhill had determined in May 2006 that Building 2800 required Level 3 code upgrades.  (*See* City of Lauderhill, Critique, May 18, 2006 [D.E. 92-7]).  "Level 3 alterations apply where the work area exceeds 50 percent of the aggregate of the building and made within any 12-month period."  FLA. BUILDING CODE: EXISTING BUILDING ch. 3, § 305.1 (2004).  As described by Finlay, this "50 percent rule" means "if you end up doing demolition of more than 50 percent of a building or a unit or whatever the entity is, th[en] you have to bring it up to the current codes."  (Finlay Dep. 99:22–25).  Rolyn, however, strongly disagreed with the City's determination that the "50 percent rule" applied to Building 2800.  (*See* Sweetwood Dep. 120:5–121:1).  According to an estimate made shortly after the hurricane, the damage attributable to Building 2800 was valued at $2,075.13 (*see* [D.E. 92-15]), *de minimis* compared with the total damage of $3,066,841.26 for all of Section One (*see* Donald Labonte Dep. 102:22–23, June 29, 2009).

Furthermore, asbestos was found in the ceiling, floor tile, and mastic of the buildings of Section One by March 2006.  (*See* INTERIM REPORT 14).  In June 2006 a contractor had submitted notices of asbestos renovation or demolition to the Florida Department of Environmental Protection with regard to Building 2800.  (*See* [D.E. 92-5]).

4

CASE NO. 08-61618-CIV-ALTONAGA/Brown

**B.** **Stonebridge retains Rolyn; Rolyn retains Precision**

Section One entered into a contract with Rolyn for the repair and renovation of its buildings in March 2006. (*See* Madsen Dep. Ex. 4, June 22, 2009). Rolyn had previously obtained a general commercial-liability policy, with a policy period from December 31, 2005 through December 31, 2006, from Crum & Forster. (*See* CRUM & FORSTER COMMERCIAL GENERAL LIABILITY POLICY GLO 091030 [hereinafter CRUM & FORSTER CGL]). Of the work contracted for, the roofs of several buildings needed to be replaced, including the roof of Building 2800.

To that end, Rolyn and Precision began discussing the Stonebridge project (*see* Fallis Dep. 39:24–25, July 14, 2009), and Precision presented Rolyn with a first scope of work in March 2006 (*see* Scope of Work, Mar. 15, 2006) [D.E. 64-4]), which served "to give Rolyn an idea of what the cost of reroofing a building" on the project would be (*see* Fallis Dep. 47:24–25). Rolyn asserts that it orally accepted Precision's proposal to perform the reroofing of Section One. (*See* Pl.'s Statement of Undisputed Material Facts [D.E. 65] ¶ 22). By June 2006, James Fallis, vice president of Precision, states Precision and Rolyn had a verbal understanding about the scope of work. (*See* Fallis Dep. 53:6).

Rolyn later delivered to Precision a memorandum entitled Vendor Requirements (*see* Gouge Aff. ¶ 3), which states, "Before setting up a new vendor account we need a completed W-9 (attached) and certificate of insurance showing general liability and workers compensation limits, and listing Rolyn Companies as an additional insured" (*id.* Ex. A (capitalization altered)). Precision had obtained a commercial general-liability insurance policy, with a policy period from August 4, 2006 through August 4, 2007, from Admiral. (*See* ADMIRAL COMMERCIAL LINES POLICY CA000009630-

5

CASE NO. 08-61618-CIV-ALTONAGA/Brown

01 [hereinafter ADMIRAL POLICY]).  The Vendor Requirement has no date, signature, or address.

Rolyn contends it was delivered to Precision shortly after the first scope of work was presented to

Rolyn.  (*See* Pl.'s Statement ¶ 23).  And according to Fallis, Precision orally accepted the terms of

the Vendor Requirement, "including the requirement that Rolyn be included as an additional insured

on Precision's insurance, prior to execution of the Payment Agreement for the work at Stonebridge

Gardens." (Fallis Aff. ¶ 6).

On June 22, 2006, Rolyn received a W-9 from Precision's insurance agent, listing Precision

as the taxpayer.  (*See* Gouge Aff. Ex. B).  On August 7 Precision presented Rolyn a second scope

of work (*see* Fallis Dep. 54:21–55:6), and on August 9 both Rolyn and Precision signed a payment

agreement, by which Rolyn agreed to pay Precision with funds received from Stonebridge.  (*See id.*

Ex. 65).  According to Rolyn, a certificate of insurance was delivered to Rolyn, also on August 9.

(*See* Pl.'s Statement ¶ 24).  The certificate, dated August 9, 2006, lists Precision as the named

insured, Admiral as the named insurer, and Rolyn as the named certificate holder.  (*See* Gouge Aff.

Ex. C).  Later, in February 2007, a second certificate of insurance was delivered to Rolyn, which

states, "Certificate Holder is Named as Additional Insured as respects to the General Liability."  (*Id.*

Ex. D).  The certificate also lists Rolyn as the named certificate holder.  According to Fallis, "it was

Precision's understanding that Rolyn was contractually required to be, and that Rolyn was in fact,

an additional insured under Precision's general liability insurance." (Fallis Aff. ¶ 7).

**C.     Precision begins work**

Precision began work on the roof of Building 2800 in June 2006.  But because asbestos was

found on the roofing material and because additional work, which had to be approved by

6

CASE NO. 08-61618-CIV-ALTONAGA/Brown

Stonebridge's insurer, was required, no work was done from July 24 through August 10 except for a few minor repairs to fix leaks.  (*See* Weekly-Update).  It was during this time that wet drywall and carpet were found in 16 units, yet Rolyn did not use dehumidifying equipment because the problems were considered minor.  (*See* Sweetwood Dep. 103:19–104:5).  On August 7 Precision submitted a second scope of work, which, due to asbestos, excluded removal of the roof and plywood, but still included the replacement of the roof and the plywood.  (*See* Fallis Dep. 54:21–56:9 & Ex. 63).  By the next day, Rolyn received the insurance confirmation and approval for the roof plywood replacement.  And, as stated, Rolyn and Precision signed the Payment Agreement on August 9.

The next day Precision began removing roof and plywood over building 2804.  By the end of the day, Precision had replaced what it had removed and had "dried in" the building.  (*See* Daily Update Aug. 10, 2006)).  Although "[d]ried-in means that it should hold the water" and "prevent leaking on a temporary basis" (Sweetwood Dep. 50:19–21), that

> doesn't necessarily mean that if it rains there's not going to be any leaks. . . .  [Y]ou can't say that . . . a building is complete until it's roofed.  Until it's completely roofed.  At the dry-in process it would be — you would have your first layer of felts mopped in and you would use black mastic again and seal around all the penetrations, but . . . until you install your cap sheet, you don't finish all of your penetrations, you don't finish all the flashings at all the walls; and, therefore, the possibility of having leaks at those areas is — is possible.

(Fallis Dep. 153:16–154:2).  Field notes indicate that Building 2800 had been dried in by August 18, 2006.  (*See* Daily Update (Aug. 18, 2006)).

**D.     The "Rain Event"**

A heavy rain on the weekend of August 19 caused intermittent stoppage of work for several days, and Tropical Storm Ernesto rolled through South Florida between August 29 and September

CASE NO. 08-61618-CIV-ALTONAGA/Brown

4.  The next week Rolyn discovered severe water damage to the interiors under the roof of Building 2800 which had not been covered with a tarp.  (*See* Compl. ¶¶ 15–16).  Water intrusion damaged the wall and floor coverings, appliances, contents personal to the unit owners, and portions of the common elements of the building.  (*See id.* ¶ 17).  According to Rolyn, "the cause of the water intrusion was: (i) the misapplication of felt paper to the joints where the parapet meets the flat roof, and (ii) the improper connection of drain-catch basins, integral to the gutter system, by Precision workers." (*Id.* ¶ 18).  Because it was contaminated with chemicals and building materials, the water that entered the units was considered "black."  (*See* Madsen Dep. 114:5–9).  Everything inside Building 2800 was contaminated with asbestos.  (*See* Finlay Dep. 179:1–2).  Each of the 24 units would eventually need to be gutted and reconstructed.  (*See id.* 176:16–17).

Rolyn promptly notified Precision about the damage (*see* Madsen Dep. 113:9–10; *id.* 113:22–25), and sent correspondence to Fallis asking Precision to repair the roof (*see, e.g.*, Letter from Finlay to Fallis (Sept. 6, 2006)).  Finlay also met with Precision representatives (*see* Finlay Dep. 159:20–24), and wrote, on September 12, 2006:

> As a result of the roof problems and subsequent damages that have occurred at Stonebridge, Rolyn is requesting that Precision Roofing complete the four (4) roofs that are currently in progress. . . .  Rolyn requests that the four roofs be completed within thirty (30) days of this letter.  Once these four roofs have been completed, Precision's services will no longer be needed at the Stonebridge project.

(Letter from Finlay to Fallis (Sept. 12, 2006)).  Although, according to Rolyn, Precision said it would assume responsibility (*see* Madsen Dep. 116:18–20), Rolyn received no correspondence in response (*see* Finlay Dep. 160:2–5).  Rolyn eventually decided to repair Building 2800.  (*See id.* 162:25–163:3).

8

CASE NO. 08-61618-CIV-ALTONAGA/Brown

**E.     Rolyn, Admiral, and Crum & Forster**

Meanwhile, Rolyn began to face pressure from the unit owners.  "[I]f they didn't take care of it, we would have sued them," DiDonato said, speaking of Rolyn.  (DiDonato Dep. 97:10–11).  One unit owner did sue Rolyn and Precision by the spring of 2007.  Rolyn provided a notice of claim to Admiral in March 2007.  (*See* Futrovsky Aff. ¶ 3).  Rolyn tendered that lawsuit to Admiral for defense and indemnity as an additional insured, which Admiral denied.  Admiral concluded that no written contract or written agreement that qualified as an insured contract according to its policy existed between Rolyn and Precision.  (*See* Letter from Lastowka to Hornack 4 (July 26, 2007)).  Admiral also concluded that, based on a conversation with Mark Futrovsky, president of Rolyn, Precision had not covered the roof before the rain event, and therefore a policy exclusion precluded coverage.  (*See id.* 7).

Rolyn provided a notice of claim to Crum & Forster in March 2007 as well.  (*See id.* ¶ 6).  The notice states:

> Rolyn is trying to work with the roofer to see that they complete repairs of the work itself and the resulting damage.  We are not yet aware of the status of the roofer's insurance claim — or if they have created one yet.  Rolyn would like Crum & Forster claims to work to be sure that the roofer's insurance provides coverage for the problem created by the roofer both for the roofer directly and for Rolyn as an additional insured.

(Campbell Aff. Ex. A).  Crum & Forster provided Rolyn with three reservation-of-rights letters.  (*See* Letter from Harvey to Futrovsky 9 (June 9, 2008)).  The last letter provides:

> Crum & Forster Specialty has now completed an extensive investigation of this loss. . . .
>      . . . .
>
> Crum & Forster Specialty has . . . determined that most, if not all, of the units

9

in main building 1 had already suffered water intrusion from leaks resulting from the hurricane-damaged roof prior to the August 19, 2006 rain event that took place while Precision was performing the re-roofing work on main building 1 in Section I. This water intrusion is not damage for which Rolyn would be legally liable. . . .
. . . .

Crum & Forster Specialty is defending Rolyn under a reservation of rights in a claim made by Allstate Floridian Insurance Company as subrogee of unit owner Margaret Walbridge. Crum & Forster Specialty's determinations with respect to the other units in main building I of Stonebridge . . . do not affect handling of the Walbridge claim as the Walbridge claim is in suit and thus involves different considerations. Crum & Forster Specialty will therefore continue to defend Rolyn in the *Walbridge* action subject to all reservations stated in the reservation of rights letter directed to that specific claim and dated December 10, 2007. . . .

With the exception of the Walbridge claim, Crum & Forster Specialty is unaware of any other claim having been made against Rolyn by any owner of the damaged units. If any owners make claims, the company will consider them individually, just as it has the Walbridge claim.

(*Id.* 1–5).

## F.    Rolyn repairs the interiors of Building 2800

Rolyn had stopped work on Building 2800 for about eight months in the spring through the fall of 2007 because of contract and payment issues with Stonebridge. (*See* Finlay Dep. 82:4–83:5; Sweetwood Dep. 181:9–15). Rolyn did, however, retain a contractor to begin asbestos abatement in July 2007. (*See* Regan Dep. 118:16–119:8). By July 2007 Building 2800 had not been gutted (*see id.* 120:19–121:1), and it was not until August 2007 that Rolyn pulled the permits to rebuild the interiors of the units (*see* Sweetwood Dep. 127:10–23). Nonetheless, Rolyn eventually repaired Building 2800. As summed up by Rolyn, "under threat of lawsuit, without help from its negligent subcontractor, and without assistance from its insurer, [it] tried to do 'the right thing' by undertaking the necessary repairs." (Pl.'s Mot. 5).

### G.    Procedural history

In September 2008 Rolyn filed a three-count complaint in state court against Precision, Crum & Forster, and Admiral.  Count I is for breach of contract against Precision.  Counts II and III seek judgments against Crum & Forster and Admiral declaring that the insurance policies cover the damages to Building 2800.  Specifically, Rolyn seeks a declaration that Crum & Forster and Admiral are required to defend and indemnify Rolyn for damages associated with the rain event, as well as to reimburse Rolyn for any expenses or damages incurred.  Crum & Forster removed the action to federal court in October 2008.  Crum & Forster asserted a counterclaim against Rolyn seeking a declaratory judgment that it owes Rolyn no obligation to indemnify or defend.  (*See* Def. Crum & Forster's Am. Answer & Affirmative Defenses to Pl.'s Compl., & Countercl. Against Rolyn [D.E. 31] 6–14).  After Precision failed to appear or otherwise defend, final judgment was entered against Precision in the amount of $1,339,435 on January 5, 2009.  Precision moved for relief from the default final judgment in June, but that motion was denied on July 30, 2009.  Rolyn, Crum & Forster, and Admiral filed the Motions currently before the Court in September 2009.

## II.  LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  The Court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc).

CASE NO. 08-61618-CIV-ALTONAGA/Brown

## III.  ANALYSIS

This section is divided into two parts: Part A and Part B.  In Part A the Court addresses Rolyn's Motion for Summary Judgment Against Crum & Forster and Crum & Forster's Motion for Summary Judgment. In Part A "the parties" refers exclusively to Rolyn and Crum & Forster, and "the policy" refers exclusively to the Crum & Forster Policy, unless otherwise stated.  In Part B the Court addresses Rolyn's Motion for Summary Judgment Against Admiral and Admiral's Motion for Summary Judgment Against Rolyn.  In Part B "the parties" refers exclusively to Rolyn and Admiral, and "the policy" refers exclusively to the Admiral Policy, unless otherwise stated.

### A.      The Rolyn–Crum & Forster Motions

#### 1.      *Applicable Law*

Because the Court has jurisdiction owing to diversity of citizenship,[3] Florida law applies. *See Sphinx Int'l, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 412 F.3d 1224, 1227 (11th Cir. 2005).  Under Florida law, the analysis of insurance-coverage disputes begins with the language of the policy:

> Florida courts have said again and again that insurance contracts must be construed in accordance with the plain language of the policy.  However, if the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage, the insurance policy is considered ambiguous.  Such ambiguities are construed in favor of the insured and strictly against the drafter.  And in cases . . . that involve exclusions to insurances contracts, the rule is even clearer in favor of strict construction against the insurer: exclusionary provisions which are ambiguous or otherwise susceptible to more than one meaning must be construed in favor of the insured.  But courts should not strain to find ambiguity.  Only when a genuine inconsistency, uncertainty, or ambiguity in meaning

---

[3]  Rolyn is a citizen of Maryland and Florida.  Crum & Forster is a citizen of Arizona and New Jersey. The parties agree that Florida law applies to the policy.  (*See* Pretrial Stipulation [D.E. 102] ¶ 7(b)).

CASE NO. 08-61618-CIV-ALTONAGA/Brown

remains after resort to the ordinary rules of construction is the rule about ambiguity apposite.  In sum, if there is no genuine ambiguity, there is no reason to bypass the policy's plain meaning.

*Id.* at 1227–28 (citations, alterations, and internal quotation marks omitted).

    2.    *Coverage*

        *a.*    The insuring agreement

According to Rolyn, Precision's faulty workmanship caused Rolyn to incur costs to repair the interiors of Building 2800.  Rolyn states the insuring agreement of the policy covers these costs. Under the insuring agreement, Crum & Forster must pay for

> those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.
>     . . . .
>
> b.  This insurance applies to "bodily injury" and "property damage" only if:
>
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; . . . .

(CRUM & FORSTER CGL (bold omitted)).  The policy defines the term "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.*).  Although the term "accident" is undefined, it has been held to "encompass[] not only 'accidental events,' but also injuries or damage neither expected nor intended from the standpoint of the insured.'"  *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1076 (Fla. 1998). Under Florida law, "faulty workmanship that is neither intended nor expected from the standpoint of the contractor can constitute an 'accident' and, thus, an 'occurrence' under a post-1986 CGL policy."  *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 888 (Fla. 2007).

CASE NO. 08-61618-CIV-ALTONAGA/Brown

To determine whether there is coverage, the Court must, as a first step, determine whether there is "property damage" caused by an "occurrence." *See* 20 ERIC MILLS HOLMES, HOLMES' APPLEMAN ON INSURANCE 2D § 129.2, at 18 (2002). Because it was faulty and was neither intended nor expected from the standpoint of Rolyn, Rolyn asserts that Precision's workmanship is an "occurrence." There is ample support in the record for a finding that Precision's workmanship was faulty. Precision began work on August 10 and continued working through August 26. After the rain event, Rolyn documented the resulting damage. Field notes of the week of September 4 indicate that Rolyn began "[c]ompiling a list of units that were damaged due to the leaks and not as a result of the hurricane. . . . Requested Precision schedule a time to walk through units that have received additional damage." (Weekly Update, Sept. 4–10). Several Rolyn employees testified about the condition of Building 2800 after the rain event. "In several units I had ceilings that were on the ground, wet carpet and a lot of water stains." (Sweetwood Dep. 150:19–20). Furthermore, "the majority of those units [in Building 2800], if not all of them, had asbestos contamination" (Finlay Dep. 104:17–18), because "the ceilings had collapsed because of the water intrusion through the roof," (*id.* 104:20–21). In sum:

> After the rain event occurred there were additional damages which needed to be taken care of. Among those was asbestos removal in either all or the majority of the units. That work we did not consider to be part of the initial claim for insurance as a result of Wilma, but rather a separate event which was created by the roofer not completing his tasks in the appropriate fashion and allowing the water to enter the building during the rain event.

(Madsen Dep. 112:3–12).

Shortly after the rain event, Rolyn contacted Precision (*see id.* 113:9–25), and tried to have Precision repair the damage to the interiors (*see* Finlay Dep. 159:20–23; Letters from Finlay to Fallis

14

CASE NO. 08-61618-CIV-ALTONAGA/Brown

(Sept. 6, 12 & Nov. 2, 2006)).  One Building 2800 unit owner said it was "[n]ot until after the rain event [did] I ha[ve] water intrusion in the 2800 1-A apartment."  (DiDonato Dep. 83:21–22).  Based on this evidence, and viewing it in the light most favorable to Crum & Forster, the Court finds that Precision's workmanship on the roof of Building 2800 was faulty, and neither intended nor expected from the standpoint of Rolyn.  It follows that Precision's faulty workmanship is an "occurrence" according to the policy.  *See J.S.U.B.*, 979 So. 2d at 888.  This same evidence shows that Precision's faulty workmanship caused "property damage," which the policy defines as "[p]hysical injury to tangible property."  (CRUM & FORSTER CGL).  Water intrusion appears to have caused water damage, collapsed ceilings, and asbestos contamination in many units.  This is property damage to which the insurance applies.[4]

Crum & Forster does not seriously contest that Precision's workmanship was faulty, that water intrusion resulted from it, or that the water intrusion caused damage, even if the property was damaged already.  Crum & Forster does contest how much of the damage was due to Precision, as well as the cause of the entire damage to the interiors of Building 2800.  What caused the damage that Rolyn eventually repaired, asserts Crum & Forster, is a question of disputed fact.  Crum & Forster frames the issue in two ways: The first is whether Rolyn was legally obligated to pay as damages the costs of gutting and rebuilding all 24 units; the second is whether the damage claimed by Rolyn was caused by an "occurrence."  These questions are related, and above all they concern causation.  After thorough review, the Court agrees that these present disputed issues of material fact that cannot be decided here.

---

[4] *But see infra* Part III.A.4.a.

15

CASE NO. 08-61618-CIV-ALTONAGA/Brown

The policy covers "those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." (CRUM & FORSTER CGL). That means Crum & Forster must "pay 'damages' for which the insured becomes liable on account of . . . 'property damage.'" 20 HOLMES, *supra*, § 129.2, at 81. It follows that Crum & Forster need not pay damages for which Rolyn becomes liable that are *not* on account of "property damage." (Nor must Crum & Forster pay damages for which Rolyn never becomes liable in the first place.)

Crum & Forster first questions whether Rolyn was legally obligated to pay for costs of gutting and rebuilding the interiors of Building 2800. According to Crum & Forster, the building already "had to be gutted because in the months after the hurricane the units sat abandoned and without electrical power, in hot, humid, and rainy conditions, while the hurricane-damaged roof allowed continuing and repeated water intrusion into the building, which resulting [sic] in extensive mold." (Def.'s Opp'n 3). This was damage, states Crum & Forster, that Rolyn was not legally obligated to pay. (*See id.*).

There is support in the record for Crum & Forster's position. First, water intrusion or mold growth had been observed by May 2006, and by July wet drywall and carpet had been reported in 16 of the 24 units. Photographs that were taken in July 2006 of building 2804 show what Crum & Forster says, and what appears to be mold: dark spots dot the ceilings and walls of units 1-A, 2-A, and 2-B. (*See* [D.E. 92-10]). According to one expert, "mold had potential to adversely affect the entire 2800-2802-2804 building without any further water intrusion into the building after July 26, 2006." (Letter from Coffee to Harvey 3 (Aug. 10, 2009) [D.E. 92-12]). Further, it was not until August 2007 that Rolyn began repairing the interiors — one year after the rain event. That was more

16

CASE NO. 08-61618-CIV-ALTONAGA/Brown

than enough time, according to the expert, "to adversely affect" all of Building 2800.

Next, Crum & Forster points to conflicting evidence about what repairs were needed to Building 2800 before the rain event. The City of Lauderhill determined in May 2006 that Building 2800 required Level 3 code upgrades, which meant that property damage exceeded 50 percent of the assessed value. (As stated, Rolyn disagreed that the "50 percent rule" applied to Building 2800. This was based chiefly on an estimate, made shortly after the hurricane, showing that the value of the repairs to be made to Building 2800 was next to nothing.) Moreover, asbestos was reportedly found in the ceiling, floor tile, and mastic of the buildings of Section One by March. An asbestos contractor was prepared to remove the asbestos by June 2006.

It seems plain that water intrusion after the rain event caused damage to the interiors of Building 2800. But it does not follow that *all* the costs Rolyn incurred were attributable to the rain event. Were "all" the units damaged because of asbestos, or just the "majority"? (*See* Finlay Dep. 104:17–18). Of those units that were gutted because of mold, if any were, was that mold due to the water intrusion or to the lack of air conditioning and pre–rain-event leaks? (*See id.* 7–8). Property damage not due to the rain event is not "property damage" according to the policy. That is because it was not caused by an "occurrence," *i.e.*, Precision's faulty workmanship. And Rolyn would not be legally obligated to pay damages for it. Viewing the evidence in the light most favorable to Crum & Forster, there is a disputed issue of fact about what damage was due to Precision, the only damage for which Rolyn would be legally obligated to pay.[5]

---

[5] The Court notes Crum & Forster's assertion that Rolyn must have been *found* legally obligated to pay damages to Stonebridge before any obligation on Crum & Forster's part arises. (*See* Def.'s Opp'n 2; Def.'s Mot. 10; *Trinity Outdoor, LLC v. Cent. Mut. Ins. Co.*, 679 S.E.2d 10, 12 (Ga. 2009)). While that may

CASE NO. 08-61618-CIV-ALTONAGA/Brown

Crum & Forster's second asserted issue relates to the first: Damages because of mold could not have been unexpected from the standpoint of Rolyn.  That is because Rolyn, a water-and-mold mitigation specialist, knew of leaks both before and after the rain event and yet did not use water-mitigation procedures.  To Crum & Forster, the "question then becomes whether the damage resulting from Rolyn's knowing failure to conduct water mitigation efforts in the 2800 building, either before or after the 'rain event,' was caused by an 'occurrence.'"  (Def.'s Opp'n 6).

Crum & Forster relies on *Walnut Grove Partners, L.P. v. American Family Mutual Insurance Co.*, 479 F.3d 949 (8th Cir. 2007), which concluded that damage due to mold about which an insured knew for six months was not an "accident."  Similarly, Crum & Forster states that any "property damage" here that was due to mold was not unexpected from the standpoint of Rolyn, and therefore not caused by an "occurrence."  Rolyn contends that this argument is generally inapplicable because the rain event caused "an instantaneous destruction of the Building 2800 interiors."  (Pl.'s Reply 5).  At bottom, these arguments concern the cause of the damages that Rolyn repaired.  These arguments present issues of disputed fact.

> b.    Mitigation

Relying chiefly on *Leebov v. United States Fidelity & Guaranty Co.*, 165 A.2d 82 (Pa. 1960), Rolyn asserts that the costs it incurred to mitigate its damages should be treated as covered losses.  (*See* Pl.'s Mot. 7).  In *Leebov* the land on which the insured was excavating slid away, damaging a

---

be true, Crum & Forster has provided little law on the point.  Because Crum & Forster prevails on other grounds, the Court sees no reason to address that question.  *See also* 20 HOLMES, *supra*, § 129.2, at 91 ("The better interpretation and construction of the insurer's promise to 'pay those sums that the insured becomes legally obligated to pay' requires only that the insured must have an 'obligation' to pay.").

CASE NO. 08-61618-CIV-ALTONAGA/Brown

nearby house. *Id.* at 83. The insured "immediately ceased" his work, stabilized the ground, hired a shoring expert, and called his insurer: all at a cost of over $13,000 to repair the damage and prevent further losses. *Id.* at 83–84. The insurer refused to pay on the basis that the insured's liability arose because of a contract with the shoring expert. *Id.* The insured recovered in the trial court, and the judgment was affirmed.

Distinguishing an insurance policy in a case relied on by the insurer,[6] the court found the policy at hand "not so limited. . . . [The insurer] agreed to pay such sums as the plaintiff became obligated to pay 'by reason of' the liability imposed upon him by law for damages because of injury to or destruction of property." *Id.* The court continued: "If the plaintiff had not taken immediate and substantial measures to remedy the perilous situation, disastrous consequences might have befallen the adjoining and nearby properties." *Id.* Furthermore:

> It is folly to argue that if a policy owner does nothing and thereby permits the piling up of mountainous claims at the eventual expense of the insurance carrier, he will be held harmless of all liability, but if he makes a reasonable expenditure and prevents a catastrophe he must do so at his own cost and expense.

*Id.*

"In accordance with *Leebov*," asserts Rolyn, "coverage for Rolyn's costs to proactively attempt to mitigate and minimize its future liability exists as a matter of law and public policy." (Pl.'s Mot. 8). In its Motion, Rolyn regards as mitigation costs those incurred for "interior damage

---

[6] The policy, incidentally, is quite similar to that of Crum & Forster. *Compare Leebov*, 165 A.2d at 84 ("[T]he carrier agreed — to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of destruction of property." (alterations, emphasis, and internal quotation marks omitted)), *with* (Crum & Forster CGL ("We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies.")).

CASE NO. 08-61618-CIV-ALTONAGA/Brown

renovation." (*Id.*). But in its Reply, what Rolyn regards as mitigation costs is not as clear. (*See* Pl.'s Reply 4 ("Rolyn's use of conventional water intrusion mitigation efforts after the Rain Event could have worsened the damage to Building 2800. Therefore, the affirmative decision not to use water mitigation efforts actually constituted mitigation." (citation and emphasis omitted))).

*Leebov* helps Rolyn little. Regarding the repair of the units of Building 2800, Rolyn only began to repair them in August 2007 — one year after the rain event. The timing and circumstance differ markedly from the immediate steps to prevent the landslide in *Leebov*. At any rate, the costs Rolyn incurred in gutting and renovating the interiors are not "mitigation costs," which are "[a] party's expenditures to reduce an existing harm so that further damage might be halted, slowed, or diminished." BLACK'S LAW DICTIONARY 372 (8th ed. 2004). Even if they prevented lawsuits, the repairs here were not done to reduce existing harm or to halt further damage. Rather, the repairs were done to make the interiors like new.[7]

3.  *The voluntary-payment provision*

Crum & Forster moves for summary judgment on the ground that the costs Rolyn incurred were made voluntarily in violation of the voluntary-payment provision, a condition of the Crum & Forster Policy:

> 2. Duties In The Event Of Occurrence, Offense, Claim Or Suit
>          . . . .
>
> d.  No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our

---

[7] Regarding Rolyn's decision not to use water-mitigation efforts after the rain event, the Court fails to see how the policy covers "costs" for doing nothing, even if doing nothing prevented further asbestos contamination.

CASE NO. 08-61618-CIV-ALTONAGA/Brown

consent.

(CRUM & FORSTER CGL (bold omitted)).

Courts enforce voluntary-payment provisions.  *See Zurich Am. Ins. Co. v. Frankel Enters.*, 287 F. App'x 775 (11th Cir. 2008); *U.S. Fire Ins. Co. v. Freedom Vill. of Sun City Ctr., Ltd.*, 279 F. App'x 879 (11th Cir. 2008); *Hathaway Dev. Co. v. Ill. Union Ins. Co.*, 274 F. App'x 787 (11th Cir. 2008); *Am. Reliance Ins. Co. v. Perez*, 712 So. 2d 1211 (Fla. 3d DCA 1998); *First Am. Title Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, P.A.*, 695 So. 2d 475 (Fla. 3d DCA 1997); *see also Jamestown Builders, Inc. v. Gen. Star Indem. Co.* 91 Cal. Rptr. 2d 514 (Ct. App. 1999).  "If the insured effects a settlement with the injured person without the previous consent of the insurer as required by the policy, the insurer is thereby released, unless otherwise excused, as, for example, when the insurer withdraws or refuses to defend."  22 HOLMES, *supra*, § 137.10[A][1], at 190–91 (footnote call numbers omitted).  According to *Jamestown Builders*, the case on which Crum & Forster chiefly relies, voluntary-payment provisions

> are designed to ensure that responsible insurers that promptly accept a defense tendered by their insureds thereby gain control over the defense and settlement of the claim.  That means insureds cannot unilaterally settle a claim before the establishment of the claim against them and the insurer's refusal to defend in a lawsuit to establish liability. . . .  In short, the provision protects against coverage by fait accompli.

91 Cal. Rptr. 2d at 517.

But there are exceptions.  "[I]nsurers that decline a tendered defense are out of luck."  *Id.* at 518.  An insurer may not abandon its insured, leaving it "exposed to the possibility of a default judgment." *Id.*  Similarly, an insured may avoid a voluntary-payment provision by making payments "involuntarily because of circumstances beyond its control," such as "a situation requiring immediate

21

CASE NO. 08-61618-CIV-ALTONAGA/Brown

response to protect its legal interests." *Id.* (citing *Fiorito v. Superior Court*, 277 Cal. Rptr. 27, 30 (Ct. App. 1990)).

The U.S. Court of Appeals for the Eleventh Circuit recently examined a voluntary-payment provision identical to the one in the Crum & Forster Policy. In *Hathaway Development* a contractor sought to recover the costs it incurred in repairing the faulty workmanship of its subcontractors. 274 F. App'x at 787.[8] Before notifying its insurer and without obtaining its consent, the contractor made the payments and repairs. The district court granted summary judgment in the insurer's favor because the contractor did not comply with the voluntary-payment provision,[9] and the Eleventh Circuit affirmed:

> The undisputed facts . . . indicate that [the contractor] breached the Policy by undertaking to fix defects and make payments to residents, albeit with good intention, yet without [the insurer's] prior consent. The language is clear, and the district court was correct, in determining that [the contractor] made such payments at its peril and not at the cost of the insurer.

*Id.* at 791 (citation omitted).

Another recent case is *Freedom Village*, where a company and its owner, each insured under primary- and excess-coverage policies, were sued in tort. 279 F. App'x at 880. The excess-coverage policy "prohibited the 'assumption of any obligation or incurring of any expense' . . . without consent from [the excess insurer]." *Id.* (alterations omitted). The insured eventually settled, but did so without the consent of the excess insurer, which later filed suit seeking a declaration that it was

---

[8] The case of *Hathaway Development* began in Georgia. Nevertheless, general principles of Florida and Georgia law are similar in the area of construing insurance policies. *See Penzer v. Transp. Ins. Co.*, 545 F.3d 1303, 1308 (11th Cir. 2008).

[9] "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [the insurer's] consent." *Id.* at 791.

CASE NO. 08-61618-CIV-ALTONAGA/Brown

not bound by the settlement.  The district court granted summary judgment in its favor, and the

Eleventh Circuit affirmed: "In Florida, an insured may not enter a settlement without the consent of

the insurer unless its insurer wrongfully fails to provide a defense." *Id.* at 881 (citing *Perez*, 712 So.

2d at 1212–13; *First Am. Title*, 695 So. 2d at 477).

> The effect of voluntary-payment provisions in Florida is stated in *Perez* thusly:
>
> > While an insured is free to enter into a reasonable settlement when its insurer has
> > wrongfully refused to provide it with a defense to a suit, we find that the insured is
> > not similarly free to independently engage in such settlements where, as here, the
> > insurer had not declined a defense to suit.  Consequently, . . . the insured's failure to
> > comply with the relevant policy provisions relived the insurer of its obligations under
> > the policy . . . .

712 So. 2d at 1212–13 (quoting *First Am. Title*, 695 So. 2d at 477) (alteration omitted)).  "[T]his

language[10] requires the insured to obtain the insurer's consent before settling." *Id.* (citing *United

Nat'l Ins. Co. v. Jacobs*, 754 F. Supp. 865, 870 (M.D. Fla. 1990)).

Here, Rolyn did not obtain Crum & Forster's consent before making payments or incurring

costs with regard to Building 2800.  (*See* Campbell Aff. ¶ 5).[11]  Nor has Crum & Forster wrongfully

refused to provide Rolyn with a defense to any suit.  To the contrary, when one unit owner sued for

damages, Crum & Forster undertook Rolyn's defense.  (*See* Letter from Harvey to Futrovsky, *supra*,

6).  In accordance with the voluntary-payment provision and case law, it appears, therefore, that

Rolyn may not recover any voluntarily made payments or costs.

--------------------------------------------------

[10] "[T]he insured will not except at the insured's own cost, voluntarily make payment, assume
obligation or incur expense other than for first aid to others at the time of the bodily injury." *Id.* at 1213.

[11] Nor has Rolyn asserted that Crum & Forster consented to any of the payments made or to the
expenses incurred, either expressly or otherwise.

CASE NO. 08-61618-CIV-ALTONAGA/Brown

Rolyn asserts that Crum & Forster's reliance on the voluntary-payment provision "misses the mark." (*See* Pl.'s Opp'n 3). "First, Rolyn's payments to renovate Building 2800 were not voluntary and, in fact, Rolyn was already under an obligation to perform that work. Second, Crum was notified prior to any renovations and had ongoing knowledge of the progress of reconstruction." (*Id.* 3–4). The Court addresses each of these arguments in turn.

Because the word "voluntarily" is not defined in the policy, Rolyn states it should be given its "everyday meaning." (*Id.* 4 (citing *Hrynkiw v. Allstate Floridian Ins. Co.*, 844 So. 2d 739, 742 (Fla. 5th DCA 2003))). "Voluntary" means "'acting or done without compulsion or obligation' and 'made without valuable consideration.'" (*Id.* (quoting THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 2131 (2d ed. 1987))). Rolyn asserts that the payments were not made "voluntarily" as the word is understood by ordinary persons, for two reasons: first, because it was facing a big lawsuit, Rolyn was forced to make them; second, because Rolyn's contract with Section One made it responsible for the acts of its subcontractors, Rolyn was obligated to repair the damages of Building 2800.

Rolyn's first reason is unpersuasive. The provision falls under the subheading, "Duties In The Event Of Occurrence, Offense, Claim Or Suit." According to the plain language of the policy, this provision applies, *i.e.*, Rolyn must obtain consent before making a payment, even if Rolyn is sued. If payments may be made voluntarily *in the event* of being sued, *a fortiori* they may be made voluntarily *at the threat* of being sued. This of course does not mean that all payments made on being sued are "voluntary;" an insured may incur costs if it must respond immediately to protect its legal interests, such as to avoid default. *See Jamestown Builders*, 91 Cal. Rptr. 2d at 518. But

24

CASE NO. 08-61618-CIV-ALTONAGA/Brown

nothing here shows such a need.  To the contrary, Rolyn worked with Precision for months, giving it "every opportunity to return to the Project and fix the problems caused by its defective workmanship."  (Pl.'s Opp'n 2).

Perhaps the strongest indication that Rolyn did not act involuntarily is that by June 2008 only one owner had sued Rolyn (*see* Madsen Aff. ¶ 10), and Crum & Forster had defended that lawsuit (*see id.* ¶ 11).  Crum & Forster, to be sure, took over a year to investigate the damage.  But regarding any lawsuits, Rolyn was not left to its own devices.  Reading the voluntary-payment provision as a whole, *i.e.*, taking into account the subheading, leads to a rejection of Rolyn's interpretation.  *See J.S.U.B.*, 979 So. 2d at 877 ("[I]n construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its fully meaning and operative effect." (internal quotation marks omitted)).

Next, Rolyn, owing to its contract with Section One, says it was obligated to repair the damages.  And because "voluntary" means "without obligation," the costs Rolyn incurred were not voluntary, and thus the provision does not apply.  While creative, this argument fares no better than the first.  By definition, the policy covers only those sums the insured becomes legally obligated to pay.  Taking Rolyn's argument to its extreme, as long as it was legally obligated to pay, Rolyn never would have to obtain consent from Crum & Forster before making payments or incurring costs.  This interpretation would effectively delete the voluntary-payment provision from the policy.  Although courts must give words their "everyday meaning," *Hrynkiw*, 844 So. 2d at 742, they must not render other provisions meaningless, *see Moore v. State Farm Mut. Auto. Ins. Co.*, 916 So. 2d 871, 877 (Fla. 2d DCA 2005) ("We will not interpret a contract in such as way as to render provisions

25

meaningless when there is a reasonable interpretation that does not do so.").

Rejecting the same argument for a different reason, the court in *Jamestown* remarked that the insured "ignore[d] another option: It could have tendered the matter to the [insurer], thereby allowing the insurer to negotiate with the homeowners, involve other insurance carriers or involve the subcontractors and their insurance carriers." 91 Cal. Rptr. 2d at 519 n.4. Here, Rolyn provided a "notice of claim" to Crum & Forster in March 2007. (*See* Campbell Aff. ¶ 2). But according to the notice, Rolyn was "trying to work with the roofer to see that they complete repairs of the work itself and the resulting damage." Rolyn did request for Crum & Forster "to be sure that the roofer's insurance provides coverage for the problem created by the roofer both for the roofer directly and for Rolyn as an additional insured." But there is no evidence that Rolyn ever requested Crum & Forster to pay for any of the repairs it made. (*See id.* ¶ 5). Nor did Crum & Forster appear to have reason to expect to pay for the repairs. According to the manager of Crum & Forster's construction-defect unit, a representative from Section One said its "property insurer was paying for all of the electrical, plumbing, HVAC, sheetrock, drywall, windows, doors (interior and exterior), and the shell of the building, and that each individual unit owner was paying for cabinets, rugs, tile floors, and interior niceties." (*Id.* ¶ 3). In sum, while the notice made Crum & Forster aware of the damages and asked for its help with Admiral, Crum & Forster never denied coverage outright.

Regarding its second ground for contesting Crum & Forster's reliance on the voluntary-payment, Rolyn asserts that Crum & Forster "was notified prior to any renovations and had ongoing knowledge of the progress of reconstruction." (Pl.'s Opp'n 4). Rolyn tries to distinguish *Jamestown*, where a developer, facing complaints from homeowners about leaks, paid over one

26

CASE NO. 08-61618-CIV-ALTONAGA/Brown

million dollars in repairs from 1991 until 1993. 91 Cal. Rptr. 2d at 515. During this period, the developer did not tender damage claims to its insurer or notify its insurer of the repairs or the problems. It was only in 1994 that the developer requested reimbursement from its insurer, which was denied because of the voluntary-payment provision in the policy. *Id.* at 516. The developer later sued its insurer for breach of contract, but its complaint was dismissed for failure to comply with the voluntary-payment provision. The appellate court affirmed because the insurer did not turn down a tender of a defense or disclaim coverage once it was notified, and the developer did not tender its defense to the insurer before making the payments. *Id.*

*Jamestown*, states Rolyn, is distinguishable because the developer incurred expenses *before* notifying its insurer. The holding "made sense" because the insurer was "surprised" and "caught off guard." In contrast, Rolyn notified Crum & Forster before incurring any expenses, and Crum & Forster was aware of the progress of construction. (*See* Pl.'s Opp'n 5).

Being "surprised" and "caught off guard" played no part in the ruling of *Jamestown*. Rather, the court relied on the plain language of the voluntary-payment provision and its purpose, *i.e.*, to allow an insurer that accepts a defense tendered by its insured to control the defense or settlement of the claims. *See* 91 Cal. Rptr. 2d at 517. The developer simply failed to comply. Last, Rolyn dismisses the other cases that Crum & Forster cited as "clearly not pertinent to this matter." (Pl.'s Opp'n 5). The Court disagrees. In *Frankel Enterprises*, *Freedom Village*, and *Perez*, the insurers knew about the claims, but the insureds nevertheless settled without their consent. Here, Crum & Forster knew of the damage allegedly due to Precision's faulty workmanship, but it did not know of the sums that Rolyn made until after the lawsuit was filed. (*See* Campbell Aff. ¶ 5).

27

CASE NO. 08-61618-CIV-ALTONAGA/Brown

* * *

Because the voluntary-payment provision prevents recovery of the costs Rolyn incurred in repairing the interiors of the units of Building 2800, Crum & Forster is entitled to judgment as a matter of law.  Nonetheless, two exclusions will be addressed: the Absolute Asbestos Exclusion and the Fungi or Bacteria Exclusion.

    4.    *Exclusions*

        *a*.    The Absolute Asbestos Exclusion

The Absolute Asbestos Exclusion provides:

> 1.  This policy does not apply to . . . "property damage" . . . in any way or to any extent arising out of or involving asbestos, asbestos fibers, or any product containing asbestos or asbestos fibers.
>
> 2.  This policy does not apply to "economic loss", "diminution of property", "abatement costs", or any other loss, cost, or expense including "Equitable Relief", in any way or to any extent arising out of or involving asbestos, asbestos fibers, or any product containing asbestos or asbestos fibers.
>
> 3.  This policy provides no coverage for any fees, costs, or expenses of any nature whatsoever in the investigation or defense of any claim or "suit" arising out of or involving asbestos, asbestos fibers, or any product containing asbestos or asbestos fibers.
>
>     . . . .
>
> "Abatement costs" means any actual or potential damages, costs, fees, or expenses, including the costs of inspection, removal or replacement.

(CRUM & FORSTER CGL).

Both parties' Motions address this exclusion, focusing mainly on the scope of the words "arising out of."  According to Rolyn, the "property damage" here does not arise out of asbestos, but out of the faulty workmanship of Precision.  Construing the exclusion narrowly, Rolyn asserts that

CASE NO. 08-61618-CIV-ALTONAGA/Brown

"the Absolute Asbestos Exclusion excludes coverage when the occurrence is the presence of asbestos that ultimately causes property damage.  Contrarily, if the cause of the property damage is not asbestos, the Policy presumptively affords coverage."  (Pl.'s Opp'n 9).  For this reason, Rolyn contends the exclusion is inapplicable.  For its part, Crum & Forster construes the exclusion broadly, and because the damages sought by Rolyn "undisputedly arose from the asbestos contamination, [they] are clearly and unambiguously excluded from coverage by the asbestos exclusion."  (Def.'s Mot. 16).

Regarding the scope of "arising out of," *Taurus Holdings, Inc. v. United States Fidelity & Guaranty Co.*, 913 So. 2d 528 (Fla. 2005), controls.  In *Taurus Holdings* municipalities sued a gun manufacturer to recover the costs of medical and other services due to gun violence.  *Id.* at 530.  The gun manufacturer sought coverage from its insurer, which refused to defend it on the ground the policy excluded coverage.  *Id.* at 531.  The issue was whether the damages "arose out of" the use of guns in accordance with the products-completed operations hazard exclusion.[12]  Giving a broad construction to the words, the Florida Supreme Court held that they did:

> [W]e agree with the majority of states and conclude that the phrase "arising out of your product" in the products-completed operations hazard exclusions at issue is unambiguous.  The term "arising out of" is broader in meaning than the term "caused by" and means "originating from," "having its origin in," "growing out of," "flowing from," "incident to," or "having a connection with." . . .  [T]his requires more than a mere coincidence between the conduct . . . and the injury.  It requires "some causal connection, or some relationship."  But it does not require proximate cause.

*Id.* at 540–41 (internal quotation marks altered) (citations omitted).

_____

[12] The policy excluded coverage for "all bodily injury . . . occurring away from premises you own or rent and arising out of your product."  *Id.* at 531 (capitalization altered, alteration and emphasis omitted).

CASE NO. 08-61618-CIV-ALTONAGA/Brown

As Rolyn correctly points out, the Absolute Asbestos Exclusion is not a products-completed operations hazard exclusion. Nevertheless, the Court concludes that the Florida Supreme Court would give the words "arising out of" in the Absolute Asbestos Exclusion the same meaning — if not broader, since the exclusion adds a participle, "involving." *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 660 (11th ed. 2005) (defining "involve" as, *inter alia*, "to relate closely : connect," "to have within or as part of itself : include" (capitalization altered)). Accordingly, and even construing the exclusion against Crum & Forster, the Court follows the plain meaning of the words as confirmed in *Taurus Holdings*. Any property damage "arising out of" — "originating from," "having its origin in," "growing out of," "flowing from," "incident to," or "having a connection with" — asbestos is excluded. Although the full extent of that contamination is unclear, most if not all of the damage to the interiors of Building 2800 was due in part to asbestos. (*See* Finlay Dep. 104:17–18 ("the majority of those units [in Building 2800], if not all of them, had asbestos contamination"); Madsen Dep. 112:3–12 ("After the rain event occurred there were additional damages which needed to be taken care of. Among those was asbestos removal in either all or the majority of the units.")). Property that was replaced because of asbestos is excluded from coverage.

b.      The Fungi or Bacteria Exclusion

According to the Fungi or Bacteria Exclusion, the Policy does not apply to:

a. "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

30

CASE NO. 08-61618-CIV-ALTONAGA/Brown

> b.  Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

(CRUM & FORSTER CGL).  Rolyn asserts that the Fungi or Bacteria Exclusion does not apply because the cause of the property damage was not fungi or bacteria.  Rather, the cause of the damage was water intrusion.  Relying on *Empire Indemnity Insurance Co. v. Winsett*, 325 F. App'x 849 (11th Cir. 2009), Crum & Forster disagrees.

In *Winsett* apartment renters sued the owner of the apartment for failing to build a "vapor barrier," which caused mold-related damages and injuries.  In granting summary judgment in favor of the renters, the district court used Florida's efficient-proximate-cause doctrine, which holds that if the efficient proximate cause is covered, the claim for damages will be covered — even if other causes are not covered.  *Id.* at 851 (citing *Hartford Accident & Indem. Co. v. Phelps*, 294 So. 2d 362, 364 (Fla. 1st DCA 1974)).  The Eleventh Circuit reversed: "The district court . . . overlooked the policy's unambiguous language against applying the efficient proximate cause doctrine to mold claims. . . .  The policy plainly excludes coverage for mold 'regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.'"  *Id.* at 851–52.

Like the exclusion in *Winsett*, the Fungi or Bacteria Exclusion excludes coverage for property damage that would not have occurred but for fungi "regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage."  It does not matter whether Precision's faulty workmanship caused the water intrusion, which in turn caused mold growth.  Accordingly, to the extent that any "property damage" would not have occurred but

31

CASE NO. 08-61618-CIV-ALTONAGA/Brown

for mold, it is excluded.

**B.    The Rolyn–Admiral Motions**

1.    *Applicable Law*

This is a diversity case.[13]  Florida law therefore applies, including its choice-of-law rules.

*See U.S. Fid. & Guar. Co. v. Liberty Surplus Ins. Corp.*, 550 F.3d 1031, 1033 (11th Cir. 2008)

(citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).  And in Florida the rule of

*lex loci contractus* applies to contractual disputes, including those about insurance policies.  *See id.*

(citing *Sturiano v. Brooks*, 523 So. 2d 1126, 1129 (Fla. 1988), and *Lumbermens Mut. Cas. Co. v.*

*August*, 530 So. 2d 293, 295 (Fla. 1988)).  According to that rule, "the laws of the jurisdiction where

the contract was executed govern interpretation of substantive issues regarding the contract."

*August*, 530 So. 2d at 295.  Regarding the Admiral Policy, the parties agree that Texas law applies

because it was in Texas that the policy was executed between Precision and Admiral.

Texas law is quite similar to Florida law regarding the interpretation of insurance policies:

> Generally, a contract of insurance is subject to the same rules of construction as other contracts.  If the written instrument is worded so that it can be given only one reasonable construction, it will be enforced as written.  However, if a contract of insurance is susceptible of more than one reasonable interpretation, we must resolve the uncertainty by adopting the construction that most favors the insured.  The court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.  In particular, exceptions or limitations on liability are strictly construed against the insurer and in favor of the insured.

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex.

---

[13]  As stated, Rolyn is a citizen of Maryland and Florida.  Admiral is a citizen of Delaware and New Jersey.

CASE NO. 08-61618-CIV-ALTONAGA/Brown

1991) (citations omitted).  Furthermore, "[c]ourts are required to follow elemental rules of grammar for a reasonable application of the legal rules of construction." *Gen. Fin. Servs., Inc. v. Practice Place, Inc.*, 897 S.W.2d 516, 522 (Tex. App. 1995); *accord Davis v. Pletcher*, 727 S.W.2d 29, 33 (Tex. App. 1987) ("Rules of grammar underlie all legal rules applicable in the construction of contracts.").  Courts "may neither rewrite the parties' contract nor add to its language." *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003).

  2. *Additional Insured*

  Both parties move for summary judgment on whether Rolyn qualifies as an additional insured under the policy.  By endorsement, the policy defines an additional-insured person or organization as "a contractor on whose behalf you are performing ongoing operation, but only if coverage as an additional insured is required by a written contract or written agreement that is an 'insured contract', and provided that the . . . 'property damage' . . . first occurs subsequent to the execution of the contract or agreement."  (ADMIRAL POLICY).  The policy defines "insured contract" as follows:

> That part of any other contract or agreement pertaining to your business . . . under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization.  Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

(*Id.*).

  According to Rolyn, there is a written contract between it and Precision requiring Rolyn to be named as an additional insured.  That contract, asserts Rolyn, is made up of various documents that include all of the essential terms of the contract.  (*See* Pl.'s Mot. 8).  Rolyn states that the parties performed according to those terms and states further that naming Rolyn as an additional insured was the intent of the parties.  To dispel any doubt, Rolyn asserts the intent of the parties was summed up

33

CASE NO. 08-61618-CIV-ALTONAGA/Brown

by Fallis: "Rolyn was named as an additional insured." (Fallis Dep. 169:19–170:2).

In contrast, Admiral contests whether any such contract exists at all. "The record is devoid of any written agreement or written contract requiring that Rolyn be named as [an additional insured] by Precision." (Def.'s Reply 2). But if such a contract or agreement exists, states Admiral, it does not qualify as an "insured contract" according to the policy. That is because no document indicates that Precision assumed tort liability of another party to pay for property damage to a third person or organization. (Def.'s Opp'n 10–11). Rolyn, in turn, disagrees that any written contract must be an "insured contract." Homing in on the conjunction "or," Rolyn asserts that "coverage as an additional insured must be required by one of two circumstances: (1) a written contract between Precision and Rolyn; or (2) a written agreement that is an insured contract." (Pl.'s Opp'n 3).

Without deciding, the Court assumes there is a written contract between Precision and Rolyn by which Precision was required to add Rolyn as an additional insured. The Court further concludes that the endorsement unambiguously requires a written contract to be an "insured contract." Although Rolyn's interpretation is *one* way of reading the endorsement, it is an unreasonable way. Therefore, the Court is not required to adopt Rolyn's interpretation. *See State Farm Fire & Cas. Co. v. Vaughan*, 968 S.W.2d 931, 933 (Tex. 1998) ("[N]ot every difference in interpretation of a contract or an insurance policy amounts to an ambiguity.").

Rolyn marks the division between "a written contract" and "written agreement that is an 'insured contract'" with numerals enclosed in parenthesis and inserts an extra article, *i.e.*, another "a" in front of "written agreement." Notably the endorsement does not say, "*a* written contract or *a* written agreement that is an 'insured contract.'" It says, rather, "*a* written contract or written

34

CASE NO. 08-61618-CIV-ALTONAGA/Brown

agreement that is an 'insured contract.'" (ADMIRAL POLICY (emphasis added)).  The Court declines

to add an article where one does not exist, which would suggest a separation between "written

contract" and "written agreement that is an 'insured contract.'"  "With a series of coordinate nouns,

an article should appear before each noun."  THE CHICAGO MANUAL OF STYLE ¶ 5.74 (15th ed.

2003).  But where "the things named make up a single idea, the article need not be repeated."  *Id.*

The natural reading of "a written contract or written agreement" is that the nouns form "a single

idea" that is modified by the relative pronoun "that."  And "that" makes what follows, *i.e.*, "is an

insured contract," a relative clause.  The phrase "is an insured contract" modifies that which comes

before it, *i.e.*, a written contract or written agreement.  *See* BRYAN A. GARNER, GARNER'S MODERN

AMERICAN USAGE 782 (2003); WILLIAM STRUNK JR. & E.B. WHITE, THE ELEMENTS OF STYLE 59

(4th ed. 2000).  This reasoning follows "elemental rules of grammar," *Practice Place*, 897 S.W.2d

at 522, and therefore ought to be applied.  The Court thinks it plain that the conjunction "or" does

not divorce "is an insured contract" from "a written contract."

    That this is a reasonable interpretation, of course, does not end the matter — Rolyn's

interpretation must be *un*reasonable.  *See Hudson Energy*, 811 S.W.2d at 555 ("[I]f a contract of

insurance is susceptible of more than one reasonable interpretation, we must resolve the uncertainty

by adopting the construction that most favors the insured.").  And for two reasons, it is.  First, the

terms "contract" and "agreement" are often used synonymously, *see id.*, notwithstanding that the

latter is broader than the former, *see* BLACK'S, *supra*, at 74.  And they appear to be used

synonymously here (more on this, below).  Yet a written contract requiring coverage as an additional

insured, on the one hand, and a written agreement that is an "insured contract," on the other, would

CASE NO. 08-61618-CIV-ALTONAGA/Brown

mean very different things. The former is merely a contract to procure insurance for another; the latter is a contract by which one assumes the tort liability of another. *See* Douglas R. Richmond & Darren S. Black, *Expanding Liability Coverage: Insured Contracts and Additional Insureds*, 44 Drake L. Rev. 781, 785 (1996) ("A contractual obligation to procure or provide insurance for another party is not the same as assuming the other party's tort liability . . . . The failure to procure insurance, or the failure to procure the correct insurance, is a simple breach of contract that is not covered by contractual liability insurance. The fact that a contract or a lease includes a clause requiring one party to procure or provide insurance covering the other does not make the document an insured contract." (footnote call numbers omitted)). The Court must consider the policy as a whole. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). Doing so counsels against giving the terms "written contract" and "written agreement" such vastly different meanings.

Second, and further considering the policy as a whole, the terms "contract or agreement" are used together over and over again. See, for example, the definition of an "insured contract": "That part of any other *contract or agreement* pertaining to your business . . . . Tort liability means a liability that would be imposed by law in the absence of any *contract or agreement*." (emphasis added). See also, for example, the exception to the policy's contractual-liability exclusion: "This exclusion does not apply to liability for damages: . . . (2) Assumed in a *contract or agreement* that is an 'insured contract.'" (emphasis added). In these examples, as in the endorsement, the conjunction "or" provides an alternative between a contract or an agreement. It does not split the sentences in two.

The question thus becomes whether the written contract between the parties is an "insured

36

contract." Rolyn concedes that no document contains language stating that Precision has agreed to assume the tort liability of Rolyn. Yet because the definition of insured contract does not require that it be in writing, asserts Rolyn, an insured contract may be implied by fact or law.

For two reasons, the Court finds Rolyn's argument unpersuasive. First, it is true the definition of an "insured contract" *in the policy* contains no requirement that it be in writing. (*See* ADMIRAL POLICY; *see also John Deere Ins. Co. v. De Smet Ins. Co. of S.D.*, 650 N.W.2d 601, 606–08 (Iowa 2002); Richmond & Black, *supra*, at 784 ("No requirement exists that an insured contract be written.")). But the term "insured contract" is used specially *in the endorsement*. The endorsement requires "a written contract or written agreement that is an insured contract." As stated, the relative pronoun "that" makes "is an insured contract" a relative clause, which modifies the preceding nouns, *i.e.*, a written contract or written agreement. As used in the endorsement, "that" literally restricts the defined term "an insured contract" to writing — either in a contract or an agreement. *See* GARNER, *supra*, at 782; STRUNK & WHITE, *supra*, at 59.

Second, the plain language of the definition requires that the insured *assume* the tort liability of another. *See Am. Econ. Ins. Co. v. Tex. Instruments Inc.*, No. Civ.A. 305CV0019K, 2006 WL 616017, at *2 (N.D. Tex. Mar. 9, 2006); *see also Lewis v. Hamilton*, 652 So. 2d 1327, 1330 (La. 1995). That the right to indemnity may be implied is not enough. *See Lewis*, 652 So. 2d at 1330 ("[T]he word 'assume' . . . requires some exercise of volition on the part of the insured to undertake or incur liability which did not exist prior to the assumption. In this case, the employment contract merely gave rise to the *status* of the School Board as an employer. It was the *law* governing that status, and not any contractual assumption of liability, which made the School Board liable for its

CASE NO. 08-61618-CIV-ALTONAGA/Brown

employee's tort."); *John Deere Ins. Co.*, 650 N.W.2d at 607 ("[T]he concept of 'insured contract' generally contemplates an agreement to undertake liability."); 2 ROWLAND H. LONG, THE LAW OF LIABILITY INSURANCE § 10.05[2], at 10-62 (2009) ("[I]n the CGL policy and other liability polices an 'assumed' liability is generally understood and interpreted by the courts to mean the liability *of another* which one 'assumes' in the sense that one agrees to indemnify or hold the other person harmless therefor."). To be an "insured contract," Precision must actually have assumed the tort liability of Rolyn. There are no facts in the record that support such a finding.

\* \* \*

Because Rolyn does not qualify as an additional insured under the policy, Admiral is entitled to judgment as a matter of law. Yet assuming, as Rolyn asserts, that Admiral is estopped from denying coverage consistent with *Marlin v. Wetzel Board of Education*, 569 S.E.2d 462, 472–73 (W. Va. 2002) ([B]ecause a certificate of insurance is an insurance company's written representation that a policyholder has certain insurance coverage in effect at the time the certificate is issued, the insurance company may be estopped from later denying the existence of that coverage when the policyholder or the recipient has reasonably relied to their detriment upon a misrepresentation in the certificate."), the Court will address whether the Roofing Operations Exclusion applies.

3.    *Exclusion*

The Admiral Policy contains the following endorsement:

ROOFING OPERATIONS — LIMITATION OF COVERAGE
        . . . .

This insurance does not apply to "property damage" to any building, structure or the contents thereof, caused by your failure or the failure of any subcontractor working on your behalf:

38

CASE NO. 08-61618-CIV-ALTONAGA/Brown

1.  To properly cover any unfinished roof or section of roof during the course of roofing operations against the influx or wind, rain, sleet, hail, snow or any other substance.

(ADMIRAL POLICY (bold omitted)).

Both parties move for summary judgment based on this exclusion.  According to Rolyn, the exclusion does not apply for three reasons.  First, the roof was, in fact, "finished" at the time of the rain event because it "was capable of serving its intended purpose of protecting the structure beneath it from the elements."  (Pl.'s Mot. 10).  Noting that the policy does not define "unfinished roof," Rolyn asserts that just because "the roof will have additional coverings on it . . . does not render the dry-in unfinished."  (*Id.*).  As Fallis testified,

> if a roof was dried in, Precision would not cover, or tarp, it.  Therefore, according to Mr. Fallis, a certified master roofing contractor, the water-retardant element of the roof was finished as of the date of the Rain Event such that there was no failure to "properly cover any unfinished roof."  The exclusion simply does not apply.
>
> Instead, the exclusion, properly read, clearly evokes a roofer's responsibility to cover an exposed roof against influx of natural elements.  Once dry-in occurs, that requirement has been satisfied.

(*Id.* 10–11 (citations omitted)).  Next, Rolyn asserts this exclusion ought to be read in harmony with the products-completed operation hazard, which states, "Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."  Last, "these practical, every-day circumstances render the Exclusion ambiguous resulting in a construction in favor of coverage."  (Pl.'s Reply 4).

According to Admiral, the term "unfinished roof" does not concern whether it was "dried in" at the end of each day.  Rather, because the roof had not been completed, *i.e.*, work on it still needed to be done, the roof was therefore "unfinished" and the exclusion applies.  "As the word 'unfinished'

39

CASE NO. 08-61618-CIV-ALTONAGA/Brown

is not ambiguous and is not susceptible to more than one reasonable construction, the Court must give the word 'unfinished' its plain and ordinary meaning." (Def.'s Reply 5 (first internal quotation marks added) (emphasis omitted)).

As an initial matter, the parties focus on the meaning of the words "unfinished roof" as meaning not "to properly cover."[14]  There is no genuine issue of material fact about whether the roof was covered at the time of the rain event.  No tarp had been placed on the roof because the roof was "dried in."  (*See* Fallis Dep. 155:19).  This point is not in dispute.

Nor is there a genuine issue of material fact about whether the roof was "finished," in the sense of being complete.  By the time of the rain event, more work on the roof was due to be done.  In his deposition, Fallis clearly and methodically explained the process of reroofing a flat roof and described Precision's progress with regard to the roof of Building 2800.  Precision had "hot mopped" one ply of roofing felt on top of a base sheet that Precision had attached to the wood decking.  But Precision then would have installed tapered roof insulation; hot mopped another ply of roofing felt and a modified cap sheet; and would have installed a termination bar and counter-flashing.  According to Fallis, "that would be the finished product."  By the time of the rain event, Precision had not taken these final steps.  (*See* Fallis Dep. 149:20–153:7; Madsen Dep. 88:8–91:5; Sweetwood Dep. 140:12–142:6; *see also* Letter from Finlay to Fallis, *supra* ("As a result of the roof problems and subsequent damages that have occurred at Stonebridge, Rolyn is requesting that Precision Roofing complete the four (4) roofs that are currently in progress. . . .  Rolyn requests that the four roofs be completed within thirty (30) days of this letter.  Once these four roofs have been completed,

---

[14]  More on this *infra* n.15.

CASE NO. 08-61618-CIV-ALTONAGA/Brown

Precision's services will no longer be needed at the Stonebridge project.")).

With those preliminaries out of the way, the Court returns to the question at the heart of this particular dispute, *i.e.*, was the roof of Building 2800, which had been "dried in" at day's end but was otherwise incomplete, an "unfinished roof" in accordance with the endorsement?  Of course it was.

The word "finish" is defined as follows: "to come to an end," "to come to the end of a course, task, or undertaking," "to bring to an end," and "to bring to completion or issue." MERRIAM-WEBSTER'S, *supra*, at 470.  And the word "unfinished" is defined as follows: "not finished," "not brought to an end or to the desired final state," and "being in a rough state." *Id.* at 1367.  As used in the policy, the adjective "unfinished" describes the noun "roof."  It does not, as Rolyn urges the Court, refer to "the water-retardant element" of it.  And it is undisputed that the roof had not been brought to an end, or to the desired final state, or to completion.  Although the Court must, as Rolyn correctly points out, construe the exclusion strictly against the insured, the Court may not rewrite language that is clear and unambiguous.  *See Fortis Benefits v. Cantu*, 234 S.W.3d 642, 649 (Tex. 2007); 21 HOLMES, *supra*, § 132.10, at 159.  A roof that still requires a tapered roof insulation, at least one more layer of felt to be "mopped in," and a termination bar and counter-flashings in order to be complete is "an unfinished roof."  That is the case regardless of whether the roof was "dried in"[15] or not.

---

[15] The argument here was not about whether Precision failed "to properly cover" the roof by drying it in at day's end.  Perhaps that question is best answered by the facts of this case. Regarding that question, the Court would conclude that Precision, as a matter of law, failed "to properly cover" the roof, which was unfinished at the time the property damage occurred.  If it had been properly covered, the rain event would not have caused, in Rolyn's words, "an instantaneous destruction of the Building 2800 interiors."  (Pl.'s Reply 5).

41

CASE NO. 08-61618-CIV-ALTONAGA/Brown

Were the Admiral Policy to provide coverage to Rolyn as an additional insured, the Roofing

Operations Exclusion, which is clear and unambiguous, would exclude it. *See Hudson Energy*, 811

S.W.2d at 555 ("An intent to exclude coverage must be expressed in clear an unambiguous

language.").[16]

## IV.  CONCLUSION

For the reasons stated herein, it is

**ORDERED AND ADJUDGED** as follows:

1.      Plaintiff, Rolyn Companies, Inc.'s Motion for Summary Judgment Against Defendant, Crum

& Forster Specialty Insurance Company **[D.E. 66]** is **DENIED**.

2.      Plaintiff, Rolyn Companies, Inc.'s Motion for Summary Judgment Against Defendant,

Admiral Insurance Company **[D.E. 67]** is **DENIED**.

3.      Defendant, Admiral Insurance Company's Motion for Summary Judgment Against Plaintiff,

Rolyn Companies, Inc. **[D.E. 63]** is **GRANTED**.

4.      Defendant Crum & Forster Specialty Insurance Company's Motion for Summary Judgment

**[D.E. 80]** is **GRANTED**.

5.      Final judgment for Admiral and Crum & Forster will be entered by separate order.  The Clerk

is directed to **CLOSE** this case.

6.      All pending motions are **DENIED AS MOOT**.  Any motions for costs must be accompanied

---

[16] Although Rolyn is correct that insurance policies must be interpreted as a whole, the Court sees little similarity between this exclusion and the following definition in the products-completed operations hazard: "Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed."

CASE NO. 08-61618-CIV-ALTONAGA/Brown

by a proper Local Rule 7.1 A.3 certification.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 16th day of November, 2009.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:    counsel of record

43